STATE of Wisconsin, Plaintiff-Respondent,

v.

Christopher D. JONES, Defendant-Appellant.†

Court of Appeals

*No. 2009AP2835–CR. Submitted on briefs August 3, 2010.
—Decided August 24, 2010.*

2010 WI App 133

(Also reported in 791 N.W.2d 390.)

† Petition for review denied 2-7-11.

Before Fine, Kessler and Brennan, JJ.

¶ 1. FINE, J. Christopher D. Jones appeals the judgment entered on jury verdicts convicting him of first-degree reckless homicide while armed, *see* Wis. Stat. §§ 940.02(1) & 939.63, and attempted armed robbery with the use of force, *see* Wis. Stat. §§ 943.32(2) & 939.32, in connection with the shooting of Brandon Sprewer somewhat after 10 p.m. on September 5, 2006, at the corner of 91st and Silver Spring Drive in Milwaukee. Jones raises many issues on appeal, which we discuss and reject in Part II of this opinion. Accordingly, we affirm.

## I.

¶ 2. Shortly before he was shot, Sprewer was walking near 91st and Silver Spring Drive with Edward Hervey, a friend with whom he had played in various Special Olympics sports. Hervey testified at the trial that shortly before Sprewer was shot, Jones and another male asked them if they wanted some "Ecstasy or some weed." The jury later learned that the other person with Jones was then fifteen-year-old Demonta Gray, who also testified at the trial. Hervey told the jury that he did not know what Ecstasy was, and that they did not agree to buy drugs from Jones and Gray. Hervey and Sprewer then walked in different directions, and Jones and Gray followed Sprewer. Hervey testified that he saw Jones shoot Sprewer: "I seen Jones pull out a gun and shot my friend right in front of me."

¶ 3. Hervey's account of the shooting was confirmed by Jada Carter, a citizen witness who, oddly enough, had previously worked with Sprewer at a store. She told the jury that she was in the area the night of the shooting and saw Jones "reach for something from" Sprewer, and that Sprewer "said, No." She testified that "a couple of seconds after that I heard a pop, and Brandon fell forward, and the defendant was in front of him. He had his arm out towards Brandon, and then he ran off west across 91st." She said that she did not see a gun in Jones's hand.

¶ 4. Jones's girlfriend in September of 2006, Kandace Perry, testified that on the evening of September 5th, Jones got a call and afterwards told her "[t]hat he was going to go make a move," which she translated as "[i]t's like a robbery." He wanted her to take him to 91st and Silver Spring Drive. Although she initially protested, she told the jury that she dropped him off in that

area nevertheless. She said that he had a "small and silver" gun with him. At around 10:50 p.m., Jones called her and sounded "frantic." He asked her to "come get him," telling her that "[s]omething had went wrong." She picked him up in the area of 91st and Silver Spring Drive. When they got back to her house, he told her "that the move went bad."

Q. And when he told you that the move went bad, did you ask him what had specifically occurred?

A. Yes.

Q. And what did he say?

A. He and some guy were I guess trying to rob somebody, and he shot him.

The next day, Jones told her that "the person he shot had died." Perry testified that "possibly a few days after" the shooting, Jones told her that he had shown the gun to his brother, telling him "that this was the gun with the body on it." Perry testified that on September 12, Jones gave "[t]he gun" to his brother. She also testified that when the police came to her house looking for the gun, they found Ecstasy pills, which, she said, belonged to Jones.

¶ 5. Jones's brother's girlfriend, Holly Noggle, confirmed for the jury that Jones gave a gun to his brother. After initial attempts to hide the gun, Noggle ultimately gave it to the police. The gun the police got from Noggle was received into evidence as Exhibit 16.

¶ 6. Demonta Gray confirmed the testimony of the others that Jones shot Sprewer. He told the jury that as he and Jones were walking in the area, "two black males was behind us. We stopped, turned around. Christopher asked one of the black males if they wanted

to buy any pills," which Jones said were "ecstasy pills."[1] After they "stated that they don't do drugs," and Jones said "okay," Sprewer and Hervey "sped up" and split up—"One walked towards 90th, and the other one walked towards 91st." Jones and Gray followed the fellow walking towards 91st, Sprewer. Gray told the jury that he also saw "[a] black female" in the area.

¶ 7. When they caught up to Sprewer, Gray heard Jones say "[s]ome words like give me what you got." We pick up Gray's testimony at around this point:

> A. So the black male [Sprewer] moved Christopher['s] hand and then —
>
> Q. The black male did what?
>
> A. He moved Christopher['s] hand.
>
> Q. And then what happened?
>
> A. Then I looked to my right. The black female walked across the street because she felt uncomfortable something was going wrong.
>
> Q. Then what happened?
>
> A. After that Christopher told me to grab the black male['s] cell phone.
>
> Q. Did you try to grab his cell phone?
>
> A. Yes.
>
> Q. And when you tried to grab the black male's cell phone what happened?
>
> A. The black male pushed me back.

---

[1] No one disputes that the "two black males" to whom Gray referred were Sprewer and Hervey.

Q. And when the black male pushed you back what happened next?

A. As I was trying to catch my balance I looked up, Christopher shoot [*sic*] the black male one time in the left of his shoulder like.

¶ 8. Gray told the jury that in return for his testimony, his case was plea-bargained and that he agreed to plead guilty to felony murder, as a juvenile, testifying that he was "told the worst that could happen to me is I could be held at [the juvenile facility in] Wales until I'm 25 years old," although he admitted that he was "[e]xpecting something better."

¶ 9. One of the police officers who arrived at the scene of Sprewer's shooting when Sprewer was still alive, testified that when he asked Sprewer who had shot him, he responded that "a black male with a goatee" shot him after demanding that Sprewer give him money.

¶ 10. The State also presented the testimony of a technician with the State Crime Laboratory, who described the markings that he said were imprinted by the firing process on the bullet recovered from Sprewer's body and connected with Exhibit 16, the gun recovered from Noggins.[2]

Q And is there any other gun in the world that would leave those particular type of markings on that bullet?

A No.

¶ 11. The technician testified that this was his opinion "to a reasonable degree of professional certainty." (Answering "[y]es" to the prosecutor's phrasing.)

---

[2] Jones does not contest the evidence connecting him to the gun.

On cross-examination, Jones's lawyer elicited from the technician that the procedures he followed had "no error rate."

Q And what is the expected error rate of your eyeball analysis?

A There is no error rate.

Q No error rate?

A No.

¶ 12. The technician also tied a cartridge case found at the scene of the shooting to Exhibit 16, the gun, opining that "[i]t was fired in this firearm." When asked by the prosecutor whether there was "any other gun in the world that could have fired that particular cartridge case," the technician responded "no," and asserted, in response to the prosecutor's question, that his opinion in that regard was "to a reasonable degree of professional certainty."

¶ 13. The State also presented the testimony of Percy Morgan, a person who was in the jail with Jones before Jones's trial. Morgan testified that Jones told him that "he shot a guy," whom Jones indicated was "retarded." Everyone agrees that Sprewer was a young man with special needs. On cross-examination, Morgan testified that Jones "had got a tattoo while he was in jail like with Killer Chris on his arm and like after killing a person."

## II.

¶ 14. Jones claims that he is entitled to a new trial because of many errors he contends were made by both the trial court and his lawyer. Specifically, Jones ar-

gues: (1) the type of testimony offered by the technician should never be received into evidence; (2) the technician's testimony should not have been received into evidence in this case; (3) alleged "prosecutorial misconduct" deprived Jones of a fair trial; (4) Jones's trial lawyer gave him ineffective representation; (5) there is "newly discovered evidence" that requires a new trial; and (6) the trial court erred in not letting Jones hire a postconviction expert at taxpayer expense. Additionally, Jones asserts that the trial court erred in denying his motions for postconviction relief without a hearing, and that he is entitled to a new trial in "the interests of justice." The latter two contentions turn on our resolution of the other claims.

¶ 15. As will be seen, many of Jones's contentions require a determination whether Jones's trial lawyer gave him ineffective representation. Accordingly, before we analyze Jones's arguments, we restate the ineffective-assistance-of-counsel standards.

¶ 16. To establish ineffective assistance of counsel, a defendant must show: (1) deficient representation; and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient representation, a defendant must point to specific acts or omissions by the lawyer that are "outside the wide range of professionally competent assistance." *Id.*, 466 U.S. at 690. To prove prejudice, a defendant must demonstrate that the lawyer's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. *Id.*, 466 U.S. at 687. Thus, in order to succeed on the prejudice aspect of the *Strickland* analysis, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confi-

dence in the outcome." *Id.*, 466 U.S. at 694. This is not, however, "an outcome-determinative test. In decisions following *Strickland*, the Supreme Court has reaffirmed that the touchstone of the prejudice component is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " *State v. Smith*, 207 Wis. 2d 258, 276, 558 N.W.2d 379, 386 (1997) (citations and quoted source omitted).

¶ 17. Further, courts need not address both aspects of the *Strickland* test if the defendant does not make a sufficient showing on either one. *See Strickland*, 466 U.S. at 697. Finally, our review of an ineffective-assistance-of-counsel claim presents mixed questions of law and fact. *See State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 848 (1990). A circuit court's findings of fact will not be disturbed unless they are clearly erroneous. *Ibid.* Its legal conclusions whether the lawyer's performance was deficient and, if so, prejudicial, are questions of law that we review *de novo. Id.*, 153 Wis. 2d at 128, 449 N.W.2d at 848.

¶ 18. We now turn to Jones's arguments.

A. *Bullet and cartridge-case evidence.*

¶ 19. Jones makes two interconnected arguments in connection with the State's evidence that Exhibit 16, the gun, ejected the cartridge case found at the scene of the shooting, and that Exhibit 16 also fired the bullet taken from Sprewer's body. First, he argues that evidence tying a bullet or a cartridge to a specific gun should never be admissible. Second, he contends, therefore, that the trial court erred in permitting receipt of that evidence in this case.

¶ 20. Jones seeks a blanket rule barring as a matter of course all testimony purporting to tie car-

tridge cases and bullets to a particular gun, and cites a number of articles and trial-level decisions questioning the efficacy of such evidence. In addition, The Innocence Network has submitted an amicus brief asking that we impose the following rules to cabin trial courts' admission of gun-toolmark evidence:

> [T]hat in any future cases where ballistics opinion evidence is offered, the expert (1) may not be permitted to express an opinion that the field of ballistics, firearm and toolmark comparison identification is infallible, or has an error rate of zero, or any similar such pretension; (2) may not be permitted to express an opinion to a reasonable "scientific" or "professional" certainty; (3) may express only an opinion that it is "more likely than not" that a particular identification is made; and (4) may only present opinion testimony to the jury if the witness is prepared to show (by photographs, video or other visual representations) what specific markings are being relied upon in reaching the opinion.

¶ 21. Although imposition of rules that Jones and The Innocence Network propose, if appropriate, probably would be in our purview, *see* WIS. CONST. art. VII, § 5(3) ("The appeals court . . . shall have supervisory authority over all actions and proceedings in the courts of the district."); WIS. STAT. § 752.02 ("The court of appeals has supervisory authority over all actions and proceedings in all courts except the supreme court."); *Cook v. Cook*, 208 Wis. 2d 166, 188, 560 N.W.2d 246, 255 (1997) ("The court of appeals, a unitary court, has two functions. Its primary function is error correcting. Nevertheless under some circumstances it necessarily performs a second function, that of *law defining and law development,* as it adapts the common law and interprets the statutes and federal and state constitutions in the cases it decides.") (emphasis added), as

509

shown below, such rules would violate longstanding Wisconsin law recognized by the supreme court, to which, obviously, we are bound. *See Umansky v. ABC Ins. Co.*, 2008 WI App 101, ¶ 22, 313 Wis. 2d 445, 461, 756 N.W.2d 601, 609, *aff'd*, 2009 WI 82, 319 Wis. 2d 622, 769 N.W.2d 1.

■

¶ 22. Unlike in the federal system, where the trial judge is a powerful gatekeeper with respect to the receipt of proffered expert evidence, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), Wisconsin gives to the trial judge a more-limited role: the trial judge " 'merely require[s] the evidence to be 'an aid to the jury' or 'reliable enough to be probative.' " *State v. Walstad*, 119 Wis. 2d 483, 519, 351 N.W.2d 469, 487 (1984) (quoted source and one set of quotation marks omitted). Simply stated, this is a "relevancy test." *Ibid. Walstad* explained:

> In a state such as Wisconsin, where substantially unlimited cross-examination is permitted, the underlying theory or principle on which admissibility is based can be attacked by cross-examination or by other types of impeachment. Whether a scientific witness whose testimony is relevant is believed is a question of credibility for the finder of fact, but it clearly is admissible.

*Ibid.*[3] This is still our law today. *State v. Fischer*, 2010 WI 6, ¶ 36, 322 Wis. 2d 265, 293, 778 N.W.2d 629, 642 ("We, therefore, decline to adopt a *Daubert*-like ap-

---

[3] This could also be characterized as the "Cole Porter" test:· namely, almost "Anything Goes."

proach to expert testimony and make the judge the gatekeeper."), *cert. denied*, ___ U.S. ___, 130 S. Ct. 3480 (2010).

¶ 23. Although it is true, as Jones and The Innocence Network assert, that the supreme court has applied so-called "public policy" criteria to determine that certain types of evidence should never be received in Wisconsin courts, *see State v. Dean*, 103 Wis. 2d 228, 278–279, 307 N.W.2d 628, 653 (1981) (polygraph testing) ("[W]e have not undertaken to evaluate the reliability of the polygraph. We recognize today . . . that the science and art of polygraphy have advanced and that the polygraph has a degree of validity and reliability. We are, nevertheless, not persuaded that the reliability of the polygraph is such as to permit unconditional admission of the evidence."); and *Steele v. State*, 97 Wis. 2d 72, 97, 294 N.W.2d 2, 13–14 (1980) (excluding expert mind-science opinion whether defendant had criminal-intent capacity because such "evidence is neither competent, relevant, nor probative for [that] purpose"), those decisions are essentially islands in the law because the supreme court has declined to use public-policy criteria to truncate a trial court's discretion in receiving or excluding evidence. *See State v. Davis*, 2002 WI 75, ¶¶ 14–15, 254 Wis. 2d 1, 13–14, 645 N.W.2d 913, 919–920. Indeed, as *Morgan v. Krenke*, 232 F.3d 562, 563–564 (7th Cir. 2000), recognized, *Steele*'s blanket exclusion was, in essence, based on the policy view that " '[w]hether or not there should be criminal responsibility is essentially a moral issue.' " (Quoting *Steele*, 97 Wis. 2d at 96, 294 N.W.2d at 13.)

██

¶ 24. Further, even in the federal system governed by *Daubert*, admission of firearm ballistics evidence is decided on a case-by-case basis. *See, e.g.,*

*United States v. Mikos*, 539 F.3d 706, 710–712 (7th Cir. 2008) (no error to receive evidence); *United States v. Williams*, 506 F.3d 151, 161–162 (2d Cir. 2007) (no error to receive evidence). We thus decline the requests to impose blanket rules barring or limiting the admission of the type of evidence that linked the cartridge case and bullet to the gun in this case. We leave the admission and scope of such evidence to the reasonable discretion of the trial courts to exercise under WIS. STAT. RULES 904.03 and 906.11, and to cross-examination by adversary counsel. *See Walstad*, 119 Wis. 2d at 519, 351 N.W.2d at 487 ("[T]he underlying theory or principle on which admissibility is based can be attacked by cross-examination or by other types of impeachment.").[4]

¶ 25. As we have seen, the technician tying Exhibit 16, the gun, to Sprewer's shooting was dogmatic in asserting his opinion. Not only did Jones's lawyer not object to the admission of the technician's testimony, but he also opened the door to the technician's "no error rate" response.[5] By not objecting to the trial court's

---

[4] WISCONSIN STAT. RULE 904.03 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WISCONSIN STAT. RULE 906.11 recognizes the trial judge's authority to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to do all of the following: (a) Make the interrogation and presentation effective for the ascertainment of the truth."

[5] In her main brief on this appeal, Jones's lawyer writes: "According to [the technician]'s testimony, '[t]here [was] no error rate' for that analysis, and there was no other gun in the

receipt of the technician's testimony, Jones forfeited his right to have direct review of that matter. *See State v. Johnson*, 2004 WI 94, ¶ 25, 273 Wis. 2d 626, 645, 681 N.W.2d 901, 910. Thus, the issue should be addressed in an ineffective-assistance-of-counsel context. *Ibid.*; *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) (unobjected-to error must be analyzed under ineffective-assistance-of-counsel standards, even when error is of constitutional dimension); and *State v. Carprue*, 2004 WI 111, ¶ 47, 274 Wis. 2d 656, 678, 683 N.W.2d 31, 41–42 (in the absence of an objection, we address issues under the ineffective-assistance-of-counsel rubric).

██

¶ 26. Assuming without deciding that Jones's trial lawyer was deficient in not further exploring some of the infirmities of gun-toolmark evidence that are in the postconviction materials, Jones has not shown *Strickland* prejudice. As seen from our review of the evidence (specifically, the testimony of Hervey, Carter, Perry, Noggle, and Gray), the evidence against Jones was overwhelming, and would have been so even if the gun, Exhibit 16, had never been found.[6] Significantly,

---

world that the recovered cartridge case and bullet could have come from." Although the latter part of the referenced opinion was elicited during the State's direct-examination, the "no error rate" assertion was, as we have seen, in response to a question asked by Jones's lawyer during his cross-examination of the technician. In our view, Jones's appellate lawyer should have noted this in her brief. *See Wisconsin Natural Gas Co. v. Gabe's Constr. Co., Inc.*, 220 Wis. 2d 14, 19 n.3, 582 N.W.2d 118, 119 n.3 (Ct. App. 1998) ("misleading statements in briefs" violate "SCR 20:3.3, which requires candor toward tribunals.").

[6] Of course, many killings are successfully prosecuted even though the murder weapon is never found.

Jones does not on this appeal develop any challenge to the testimony of the witnesses (other than Morgan, whom we discuss below), except to generally point out that eyewitness testimony can be frail and that the testimony of accomplices should be considered with care. Thus, assuming that the technician had never testified or, more likely, that Jones's trial lawyer had used the materials Jones proffers to us to attack the validity of the technician's conclusions, we have no doubt but that the result of the trial would have been the same. *See McDaniel v. Brown*, 558 U.S. ___, ___, 130 S.Ct. 665, 673 (2010) (per curiam) ("overstat[ing] its probative value by failing to dispel the prosecutor's fallacy" did not negate that "a rational jury could consider the DNA evidence to be powerful evidence of guilt.").[7] Thus, our "confidence in the outcome," *Strickland*, 466 U.S. at 694, of Jones's trial is firm. *See also Smith*, 207 Wis. 2d at 276, 558 N.W.2d at 386.

B. *Alleged prosecutorial misconduct.*

■

¶ 27. Whether a prosecutor engaged in misconduct and, if so, it warrants a new trial, is a legal issue that we decide *de novo. See State v. Lettice*, 221 Wis. 2d 69, 76–77, 585 N.W.2d 171, 175–176 (Ct. App. 1998) (legal issue—alleged double-jeopardy violation; prosecutor's intent a question of fact).

■

¶ 28. Jones asserts that the prosecutor in his case did not comply with Jones's pre-trial discovery request

---

[7] "The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample." *McDaniel v. Brown*, 558 U.S. ___, ___130 S.Ct. 665, 670 (2010) (per curiam).

for "any and all relevant written or recorded statements" of its witnesses because the State only gave Jones the technician's final report and not his "notes." He contends that this violated the State's obligation under Wis. Stat. § 971.23. Section 971.23(1)(e), to which Jones apparently refers, requires, consistent with Jones's pre-trial phrasing of his demand, that the State give the defendant "[a]ny *relevant* written or recorded statements" by any witness the State intends to call. (Emphasis added.) The key, of course, is, as our added italics indicate, "relevant." As Jones concedes, he now has those notes. He has not, however, pointed to anything in those notes that he contends was "relevant" to his defense. Thus, Jones has not shown a discovery violation. We will not develop his argument for him. *See League of Women Voters v. Madison Community Foundation*, 2005 WI App 239, ¶ 19, 288 Wis. 2d 128, 140, 707 N.W.2d 285, 291 (we do not decide undeveloped arguments); and *Vesely v. Security First Nat'l Bank of Sheboygan Trust Dep't*, 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985) (we do not decide inadequately briefed arguments).

¶ 29. Jones also contends that the prosecutor should have objected when the technician's testimony, in Jones's view, overstated the certainty of his opinions. This contention is based on Jones's assertion that the technician's testimony was false and that the prosecutor knew that. Jones, however, has not shown either aspect of his contention. Rather, he merely references the part of his brief seeking adoption of the blanket rule barring all gun-toolmark evidence because, in his view, that evidence "is highly questionable." In light of this, his brief's contention that "[t]he prosecutor *specifically* elicited false testimony to the effect that no other gun could have fired the bullet that killed" Sprewer, comes

close to accusing the prosecutor of suborning perjury, and is beyond the pale of acceptable argument. (Emphasis added.) We caution Jones's appellate lawyer that this unsupported assertion violates not only SCR 20:3.3 referenced in footnote 4, but also SCR 20:3.1(a)(2), which directs that "[i]n representing a client, a lawyer shall not: . . . knowingly advance a factual position unless there is a basis for doing so that is not frivolous." *See also* SCR 62.02 (Standards of courtesy).

■

¶ 30. Finally, Jones argues that the prosecutor violated his rights in his closing argument when he referred to the special-needs status of the victim. Jones points to the following:

> [T]here is a saying that says that you can judge the worth of a society by the way it protects its weak. And I am not saying that Mr. Sprewer was weak, but he was someone that did not have the faculties that most of us have, and this defendant made a choice to not let him walk the street in freedom or catch a bus or work at Osco again.

¶ 31. Jones's trial lawyer did not object; therefore, we address this issue in its ineffective-assistance-of-counsel context, discussed above.

¶ 32. Although Jones addresses, albeit in cursory form, whether Jones's trial lawyer gave him deficient representation by not objecting to the prosecutor's reference to the victim, the argument is wholly undeveloped and does not even address the prejudice aspect of *Strickland* test. As noted earlier, we will not develop or discuss inadequately briefed arguments. As seen from the overwhelming evidence of Jones's guilt that we have already noted, Jones has not shown the requisite *Strickland* prejudice. Further, if Jones's trial lawyer

had objected to the prosecutor's assertion during his closing argument, there would have been two possible scenarios. First, the trial court could have sustained it and told the jury to disregard the apparent call for sympathy; if so, that would have cured the problem, *see State v. Truax*, 151 Wis. 2d 354, 362, 444 N.W.2d 432, 436 (Ct. App. 1989) (jury is presumed to follow instructions). Second, if this were a direct-review triggered by an objection that was overruled, Jones has not shown that the prosecutor's passing comment " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *See State v. Mayo*, 2007 WI 78, ¶ 43, 301 Wis. 2d 642, 666, 734 N.W.2d 115, 126 (quoted source omitted).

C. *Alleged ineffective representation by Jones's trial lawyer.*

¶ 33. Jones's claim that his lawyer represented him ineffectively also concerns the testimony of Percy Morgan, a person who was in the jail with Jones before Jones's trial. As we have seen, Morgan testified on cross-examination that Jones "had got a tattoo while he was in jail like with Killer Chris on his arm and like after killing a person." Jones contends that he does not have a tattoo, and that his lawyer was ineffective for not determining "if Jones had the tattoo Morgan described." At sentencing, Jones did not have that tattoo. As the State points out, it is questionable whether a jail inmate could get a permanent "tattoo." Putting that aside, however, Jones was in court when Morgan testified. If Jones did not have the tattoo on that day, he could have easily told his trial lawyer. Thus, Jones's contention that his lawyer was ineffective for not investigating something that Jones could have revealed to him at the

time is wholly without merit. *See State v. DeLain*, 2004 WI App 79, ¶ 18, 272 Wis. 2d 356, 368, 679 N.W.2d 562, 568 (lawyer not ineffective for not pursuing something that defendant knew but did not reveal), *aff'd*, 2005 WI 52, 280 Wis. 2d 51, 695 N.W.2d 484. Further, as we discuss below in connection with Jones's claim that he has newly discovered evidence that entitles him to a new trial, and as we have already seen, Morgan's testimony was but a small part of the overwhelming evidence that Jones shot and tried to rob Sprewer.

¶ 34. Jones also contends that his lawyer was ineffective for not properly questioning the gun-toolmark evidence. We have already addressed this issue and found it without merit.

¶ 35. As we have seen, Carter testified that she saw Jones accost Sprewer. Jones argues that his trial lawyer was ineffective because he did not get a transcript of a hearing conducted by Jones's first trial lawyer on whether Carter went through a fair pre-trial identification process. At that hearing, it was established that she was first shown a photo array, one picture at a time, and that she picked someone other than Jones. She then indicated that she wanted to see a lineup, and Jones and five others were shown to her one at a time through a one-way glass. None of the persons in the photo array other than Jones was in the lineup. She selected Jones as the person whom she saw accost Sprewer when Sprewer was shot. Jones does not on this appeal challenge Carter's identification of him.

¶ 36. Jones claims that if his trial lawyer had a transcript of the Carter suppression hearing, he could have better cross-examined Carter on her identification of him as the person who accosted Sprewer that night. He argues in his main appellate brief that because his trial lawyer did not have the transcript, that lawyer

"was unaware of a viable and important avenue of cross examination." Although this contention sounds persuasive on its surface, it is belied by the Record because Jones's trial lawyer fully cross-examined Carter on the identification procedure nevertheless.

- Carter admitted that she did not recognize on the night of September 5th either of the two persons who confronted Sprewer that night;

- On September 15, 2006, Carter picked out from the photo array someone other than Jones as Sprewer's assailant;

- The lineup was held on October 4, 2006, and the lineup was run twice before she selected Jones;

- Carter told a detective at the lineup that, as phrased by Jones's lawyer, " 'I I think I told you no for number three [Jones] the first time. I want to change number three to yes.' ";

- The first time Carter looked at the lineup, she did not make an identification;

- Jones's lawyer knew about the pre-lineup photo array and asked Carter about it.

¶ 37. Jones has pointed to nothing that his trial lawyer could have done differently in his cross-examination of Carter if he had the transcript of the suppression hearing. Thus, he has not shown that he was prejudiced by the lawyer not having that transcript. *See State v. Flynn*, 190 Wis. 2d 31, 48, 527 N.W.2d 343, 349–350 (Ct. App. 1994) (defendant who alleges that his lawyer was ineffective because the lawyer was deficient in his or her representation must show: (1) what the lawyer should have done, and (2) how not doing it adversely affected the proceeding's reliability).

¶ 38. Jones also claims that his trial lawyer was ineffective for not objecting to the testimony by the firearm-toolmark technician. We have already dealt with that.

¶ 39. Jones claims that the "cumulative effect of all errors" shows that Jones was prejudiced by what he says was his trial lawyer's ineffective assistance. We disagree. In light of the overwhelming evidence of Jones's guilt, Jones's "cumulative" argument is without merit.

D. *Alleged newly discovered evidence.*

■■

¶ 40. Jones submitted an affidavit to the trial court by his postconviction investigator that asserts that she spoke with two persons who were incarcerated with Morgan, and that Morgan indicated to them that he was going to lie in order to implicate Jones in the homicide and attempted armed robbery, and was going to use things about the case that he had learned from the media, which had extensively covered it. Although Jones's trial lawyer indicated to the trial court after the State rested its case that Jones told him something about Morgan having told another person that he would lie in his testimony, we assume without deciding that the affidavit by Jones's postconviction investigator satisfies the preliminary hurdles that a defendant must clear, namely whether: " '(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.' " *State v. Plude,* 2008 WI 58, ¶ 32, 310 Wis. 2d 28, 48, 750 N.W.2d 42, 52 (quoted source omitted). Once these hurdles are passed, the question turns to "whether a reasonable probability exists that

520

had the jury heard the newly-discovered evidence, it would have had a reasonable doubt as to the defendant's guilt." *Ibid.* As we have already discussed at some length, the evidence of Jones's guilt is overwhelming and, even with evidence that Morgan lied, there is not a "reasonable probability" that the jury would have rejected the testimony of all the other witnesses (even if the technician's gun-toolmark evidence was discredited in whole or in part—see our earlier discussion). As we have already noted, Jones does not on this appeal develop any challenge to the testimony of the witnesses other than Morgan, except to generally point out that eyewitness testimony can be frail, and that the testimony of accomplices should be considered with care.

¶ 41. Jones also claims the research that he presented on the validity of gun-toolmark evidence is newly discovered evidence. We have already discussed this matter at length, and, for the reasons analyzed earlier, conclude that a reasonable jury would not have had a "reasonable doubt as to the defendant's guilt" if Jones's gun-toolmark contentions were presented to them.

### E. *Taxpayer funded postconviction expert.*

¶ 42. Jones complains that the trial court would not authorize Jones's postconviction defense to hire, at taxpayer expense, a metallurgist to challenge the gun-toolmark evidence.[8] Although recognizing that cases that discuss the entitlement to such funding were in the context of pre-trial requests, *see, e.g., State ex rel. Dressler v. Circuit Court for Racine County*, 163 Wis. 2d 622, 638–641, 472 N.W.2d 532, 539–540 (Ct. App. 1991), he argues that such a right also attends a defendant in a

---

[8] Jones sought that funding from the Office of the State Public Defender, which denied it.

postconviction posture when "fundamental fairness" requires it. This is not an appropriate case to either analyze or decide that issue because, as we have seen, the jury here was presented with overwhelming evidence of Jones's guilt, and, as we have already seen, the tempering or even the complete negation of the technician's testimony tying the gun to the cartridge case and to the bullet would not have affected a reasonable jury's assessment of whether Jones shot Sprewer while attempting to rob him. *See id.*, 163 Wis. 2d at 640, 472 N.W.2d at 540 (Defendant must show how "the proposed witnesses are both material and favorable to his or her defense, *i.e.*, necessary.").

F. *Alleged right to a new trial in the "interests of justice."*

¶ 43. Under WIS. STAT. § 752.35, we may order a new trial if it appears from the Record that: (1) the real controversy has not been fully tried, or; (2) it is probable that justice has for any reason miscarried. *Vollmer v. Luety*, 156 Wis. 2d 1, 19, 456 N.W.2d 797, 805 (1990). This discretionary reversal, however, is reserved for "exceptional cases." *State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662, 667 (1983). Given the overwhelming evidence of Jones's guilt, this is not such a case. Further, Jones's call for a reversal in the interests of justice merely repeats those contentions that we have already rejected. Accordingly, we decline to order a new trial. *See State v. Arredondo*, 2004 WI App 7, ¶ 56, 269 Wis. 2d 369, 405, 674 N.W.2d 647, 663–664 (Ct. App. 2003).

G. *Alleged need for a postconviction hearing.*

¶ 44. Finally, Jones contends that the trial court improperly denied his postconviction motions without a

hearing. For the reasons already discussed, no hearing was necessary because nothing Jones asserted raised issues of fact that had to be explored. *See State v. Allen*, 2004 WI 106, ¶ 9, 274 Wis. 2d 568, 576, 682 N.W.2d 433, 437 (A defendant is not entitled to a postconviction hearing if the motions for which he or she seeks a hearing do "not raise facts sufficient to entitle" the defendant to relief or "the record conclusively demonstrates that the defendant is not entitled to relief.").

*By the Court.*—Judgment and orders affirmed.