STATE of Wisconsin, Plaintiff-Respondent,

v.

Winston B. EISON, Defendant-Appellant.†

Court of Appeals

*No. 2010AP909–CR. Submitted on briefs December 7, 2010.*
*—Decided March 1, 2011.*

2011 WI App 52

(Also reported in 797 N.W.2d 890.)

† Petition for Review denied 6/15/11.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrea Taylor Cornwall*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Maura FJ Whelan*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. KESSLER, J.   Winston B. Eison appeals from a judgment of conviction and an order denying his motion for a new trial based on Eison's claim that "other acts" evidence was erroneously admitted concerning his arrest and his conduct related thereto, and that testimony by his former wife was admitted in violation of the marital privilege codified in WIS. STAT. § 905.05 (2009–10).[1] We agree with Eison, and the State's concession, that the evidence concerning his arrest and his related conduct was improperly offered by the State, but we conclude that the error was harmless. We also conclude that most of the testimony by Eison's former wife was not privileged under § 905.05, that the portions of her testimony which were privileged were *de minimis,* and their use at trial does not undermine our confidence in the fairness of the proceedings or the outcome. We affirm.

## BACKGROUND

¶ 2.   Eison was charged with one count of robbery, contrary to WIS. STAT. §§ 943.32(1)(b) & (2) (2005–06), and one count of false imprisonment, contrary to WIS. STAT. § 940.30 (2005–06), based on the armed robbery and car-jacking of Agnes Corrigan on April 21, 2006, in the City of Glendale. Corrigan was seventy-eight years old at the time of the robbery and nearly eighty-one years old at the time of trial. According to her trial testimony, Corrigan was returning to her apartment in Glendale on April 21, 2006, around 9:00 p.m. The robbery began when she pulled her car into her apartment building's parking garage and got out of her car. A man approached, showed Corrigan his gun, had some

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

conversation with her, and instructed her to get back into her car in the passenger seat; the man took the driver's seat.

¶ 3. Corrigan testified that the initial encounter outside of the car lasted three or four minutes, during which time Corrigan looked directly at her abductor while wearing her glasses. The garage was very well-lit. Prior to getting in the car, Corrigan gave her abductor all of her cash and what she believed to be her ATM card. Once in the car, Corrigan spent a couple of minutes helping her abductor figure out how to operate the vehicle. They were sitting very close together at this point. Corrigan testified that she got a better look at her abductor inside the car than she had when they were outside the car. While they were in the car but still in the parking garage, Corrigan gave her abductor her ATM pin number, which she wrote down for him several times.

¶ 4. When her abductor started driving, Corrigan had to direct him out of the parking garage, correcting several missteps as he took wrong turns and drove into dead ends. After they exited the garage onto the street, he instructed Corrigan to remove her glasses. She complied, putting them in her purse. Shortly thereafter, her abductor ordered Corrigan out of the car and drove off. She ran to a nearby bus and told the bus driver that her car had been stolen. Glendale police responded, returning Corrigan to her apartment building and obtaining information about what happened.

¶ 5. A few days later, on April 25, 2006, Eison was arrested by Milwaukee police based on an unrelated robbery of a vehicle in Shorewood. The details of the Milwaukee arrest were discussed at Eison's trial. Essentially, a particular make and model of a car was reported stolen on April 24, 2006. Milwaukee police officers

337

discovered the vehicle the next day, and saw Eison near the vehicle. Eison fled when the officers approached him. After a lengthy foot chase, Eison was apprehended and taken into custody. Eison was never charged in relation to that stolen vehicle.

¶ 6.  Glendale police learned of Eison's arrest and, thinking the Shorewood robbery and the Glendale robbery were "very similar," arranged a lineup on April 26. Corrigan identified Eison in the lineup as the person who robbed her and stole her car in Glendale. Also on April 26, Corrigan's abandoned car was recovered at 4209 North 71st Street, with a parking ticket dated April 22 and issued at 4:50 a.m. Eison and his then-wife, Cynthia Reynolds, lived at 4135 North 72nd Street, about a block away from where the car was recovered.

¶ 7.  At the trial, Reynolds, now Eison's former wife, testified that:  Eison did not return home until 2:00 a.m. on April 22, that he had not been contributing to the family financial needs, and that he falsely told her that his employer had not been paying him. In phone conversations while he was in jail, Eison told her that he had decided not to come home until he paid his gambling debt and that she should get rid of a BB gun that he told her was in their house. Reynolds found the gun and turned it over to Glendale police.

¶ 8.  Corrigan identified that same BB gun as the one that Eison held while robbing her. She also identified a photograph of a gray jacket belonging to Eison as the one worn by her abductor during the robbery.

¶ 9.  A jury found Eison guilty on both counts. His postconviction motion for a new trial based on improper admission of other acts evidence (the details of the arrest in Milwaukee) and improper admission of testimony protected by the marital privilege (Reynolds'

338

testimony) was denied. This appeal followed. We discuss the two issues separately with additional procedural and factual details as necessary.

## DISCUSSION

### I.  Standard of Review.

■■

¶ 10.  Whether evidence is relevant under WIS. STAT. § 904.02 and should be admitted lies within the discretion of the trial court. *See State v. Pepin,* 110 Wis. 2d 431, 435, 328 N.W.2d 898 (Ct. App. 1982). "If a judge bases the exercise of his [or her] discretion upon an error of law, his [or her] conduct is beyond the limits of discretion." *State v. Hutnik,* 39 Wis. 2d 754, 763, 159 N.W.2d 733 (1968). However, WIS. STAT. § 805.18(2) precludes relief on appeal "unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial."

■■

¶ 11.  Our supreme court has explained that the "test for harmless error [is] essentially consistent with the test for prejudice in an ineffective assistance of counsel claim under *Strickland v. Washington,* 466 U.S. 668 (1984)." *State v. Harvey,* 2002 WI 93, ¶ 41, 254 Wis. 2d 442, 647 N.W.2d 189 (parallel citations omitted). However, there is "a distinction in the burden of proof: ordinarily, the one who benefits from the error must prove harmlessness, but in an ineffective assistance of counsel claim, the defendant must prove prejudice." *Id.* The court in *Harvey* explained that the United States

Supreme Court set forth the test for determining whether a constitutional error is harmless in *Chapman v. California*, 386 U.S. 18 (1967). *See Harvey*, 254 Wis. 2d 442, ¶ 44. The test set forth by *Chapman* is whether it appears " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Harvey*, 254 Wis. 2d 442, ¶ 44 (citation omitted). The court in *Harvey* also relied on *Neder v. United States*, 527 U.S. 1, 4 (1999), in which the Supreme Court, using slightly different language, noted that the harmless error inquiry is essentially the same as in *Chapman*, describing the pertinent question for the test as: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " *Harvey*, 254 Wis. 2d 442, ¶ 46, citing *Neder*, 527 U.S. at 18. If the appellate court concludes that an error occurred, it must consider whether the error was harmless, even if harmlessness is not argued or harmfulness is conceded. *See State v. Neave*, 220 Wis. 2d 786, 788, 585 N.W.2d 169 (Ct. App. 1998).

## II. Other Acts Testimony.

¶ 12.   Eison contends that other acts evidence pertaining to his arrest for fleeing Milwaukee police was improperly admitted and was prejudicial. We agree that the evidence was erroneously admitted, but conclude that the admission was harmless error.

¶ 13.   In October 2007, while assisted by standby counsel Donald Hahnfeld,[2] Eison, *pro se,* filed a sixty-eight page handwritten document including sixteen

---

[2] Beginning August 4, 2006, while the case was before Judge Mel Flanagan, Eison was represented by Attorney Donald Hahnfeld. By January 24, 2007, Eison requested a new

separate motions *in limine* as a part of a larger "defense package," consisting of numerous other motions.[3] The

attorney, but the trial court denied the request. The request to remove Attorney Hahnfeld was renewed, and denied on March 9, 2007, which led to Eison's motion to represent himself. By May 20, 2007, Hahnfeld was appointed as standby counsel only.

After the case was transferred by judicial rotation to Judge Thomas Donegan, Eison moved on November 2, 2007 for appointment of a new attorney, or for a different standby counsel. Attorney Hahnfeld advised the court that his license was going to be suspended, which resulted in the appointment of Attorney Douglas Batt as Eison's attorney, not as standby counsel, on or about January 16, 2008. The trial was set for June 2, 2008. On the day of trial, Eison asked the court to remove Attorney Batt, claiming that Attorneys Batt and Hahnfeld were both ineffective because neither obtained video from the Milwaukee County Transit System showing Eison getting on a bus at the time of the robbery and neither could find Eison's claimed alibi witness.

The trial was adjourned and the trial court ordered specific action and affidavits from both attorneys relating to the bus video, if any, and the efforts to locate the claimed alibi witness.

On July 22, 2008, after a hearing, Eison's motion to remove Attorney Batt was denied. Attorney Batt represented Eison throughout the trial.

With regard to the issues of the bus video and the alibi witness, a letter from the Milwaukee County Transit System in the record indicates that the transit system only saves videos of specific instances and without a bus number there is no way to know if a video exists. Further, Eison was unaware of the last name of his alibi witness, who Eison claimed had moved to an unknown location since the robbery. Eison's aunt, who supposedly knew the alibi witness, did not respond to Attorney Batt's attempt to contact her.

[3] Eison was a prolific filer of motions. The October 2007 motions were not his only filings with the court. The record in this case contains more than 200 pages of Eison's handwritten documents filed over the life of this case at the trial court level.

341

fourth motion *in limine* was to "prohibit any flight, escape and concealment" evidence. The trial court held a hearing on all sixteen motions, except the five which Eison withdrew. We consider only the motion *in limine* involved in this appeal.

¶ 14. The State indicated at the hearing that it did *not* intend to call the arresting Milwaukee police officers to testify about the circumstances of Eison's arrest. This led the trial court to grant that motion *in limine*.[4] However, the trial court left open further ruling on the testimony, directing the following comments apparently to the State: "[I]f you believe your theory is going to change or you have a legal theory that justifies putting that in, you have a right to raise that again before trial." The State did not raise the question again before trial.

¶ 15. Attorney Douglas Batt was first appointed to replace Attorney Hahnfeld and to represent Eison on or about January 16, 2008. Trial began on September 8, 2008. Prior to the start of trial, Attorney Batt advised the court that Milwaukee police officers were present, and expressed his concern that they were going to testify to "more than that they had just turned my client over to Glendale." The same prosecutor who had appeared at the motion hearing in November 2007, when Eison's motion *in limine* was granted, acknowledged that the Milwaukee officers would be testifying to the events surrounding their arrest of Eison based on the Shorewood robbery. Attorney Batt argued that the testimony regarding the circumstances of Eison's arrest for a different offense with which he was never charged was irrelevant to the charged offenses and "too preju-

---

[4] The order granting some of Eison's October 2007 motions, and denying others, refers to each motion only by number.

dicial," although he did not specifically characterize the testimony as "other acts" evidence. The court did not specifically respond to defense counsel's concern regarding the potential testimony. No party reminded the court of its pretrial rulings that excluded evidence of flight and other acts based on Eison's arrest by Milwaukee police.

¶ 16. Milwaukee police officer Christopher Quinlan testified that on April 25, 2006, his squad was dispatched to a City of Milwaukee neighborhood regarding an orange Volkswagen that "was wanted in a major deal per [the] Shorewood Police Department. The subject with the vehicle was considered armed and dangerous." He testified that officers saw someone hiding in a yard close to the vehicle, who then fled on foot westbound through the yards when police attempted to stop him. Police pursued, and Officer Quinlan eventually looked over a fence in an alley just west of where the Volkswagen was located and observed Eison in some bushes. After Quinlan identified himself as a Milwaukee police officer and ordered Eison to stop, Eison ran around a house and across the street. Eison was taken into custody shortly afterward.

¶ 17. Milwaukee police officer Kevin Sadowski also testified that a Volkswagen had been taken in an armed robbery, and officers were told "that the subject in the area of the vehicle could possibly be armed." Upon approaching the car he believed to be the stolen car in an alley, Officer Sadowski testified that he saw Eison crouched down behind a nearby fence, then crawl over the fence and run westbound, ignoring a "Police, Stop" command. He further testified that he lost sight of Eison while chasing him through the yards, and that other officers arrested him.

¶ 18. Although Attorney Batt objected to Sadowski's testimony as cumulative, Attorney Batt registered Eison's objection to the admission of the Milwaukee police officers' testimony as irrelevant and unduly prejudicial at the conclusion of the State's case, indicating that a prior hearing should have been held regarding this "other acts" evidence. The court found that the officers' testimony was relevant to Eison's identification and was not unduly prejudicial.

¶ 19. Eison alleges that his counsel was ineffective for failing to adequately object at trial to testimony by Milwaukee police officers about the details of his arrest and for failing to request a limiting instruction. Eison also asserts that, in view of the State's concession that other acts evidence should not have been admitted based on the motion *in limine,* the trial court erred in denying him a new trial. We disagree.

■

¶ 20. First, Eison's attorney did not fail to adequately object to the testimony by the Milwaukee police officers. *See State v. Bergeron,* 162 Wis. 2d 521, 528, 470 N.W.2d 322 (Ct. App. 1991) ("A defendant who has raised a motion *in limine* generally preserves the right to appeal on the issue raised by the motion without also objecting at trial."). Because both the issue raised on appeal and the issue resolved by the motion *in limine* concern whether the Milwaukee police officers should have been allowed to testify, the issue is adequately preserved for review. *Id.* at 529 ("Whether the motion *in limine* relieves the party from having to object depends on whether the motion alerted the trial court to the same issue of fact or law that arises at trial.").

■

¶ 21. Further, a lawyer is not ineffective for not pursuing something the defendant knew, but did not

reveal. *See State v. Jones*, 2010 WI App 133, ¶ 33, 329 Wis. 2d. 498, 791 N.W.2d 390; *see also State v. DeLain*, 2004 WI App 79, ¶ 18, 272 Wis. 2d 356, 679 N.W.2d 562, *aff'd,* 2005 WI 52, 280 Wis. 2d 51, 695 N.W.2d 484. Eison himself filed the motion *in limine* that precluded this testimony. He argued the motion himself and obtained a favorable ruling, nearly a year before he was represented by Attorney Batt. The order in the court file granting the motion refers to Eison's various motions by number only and simply indicates whether the motions were granted or denied or whether rulings were reserved. The transcript of the hearing on that motion, where the court's substantive decisions are set out, contains 132 pages. The record before us bristles with motions, the bulk of which are handwritten by Eison. Attorney Batt, faced with such a record, could not reasonably be expected to excavate significant facts that Eison knew, but did not share. The existence of an *in limine* order prohibiting the officers' testimony is a matter that Eison knew about because he was acting as his own attorney at the time of the *in limine* motion and order. Eison should have told Attorney Batt about the order promptly when their relationship began.

¶ 22.   Even if Attorney Batt should have discovered the *in limine* ruling precluding the officers' testimony, his failure to do so was harmless because the evidence admitted was harmless. For an error to be harmless, it must be " 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' " *See Harvey*, 254 Wis. 2d 442, ¶ 46 (citation omitted). It is clear beyond a reasonable doubt that a jury would have found Eison guilty absent the testimony concerning his arrest. Corrigan identified Eison as her abductor in the presence of the jury and

345

gave a detailed account about her observations of Eison's appearance, mannerisms and clothing. Surveillance video from a bank near the spot where Corrigan was removed from the car shows a person in Corrigan's car attempting to use an ATM machine, and as discussed in more detail below, Reynolds' testimony indicates that Eison was unaccounted for during the time in which the robbery took place. None of this information was related to the testimony of the Milwaukee police officers.

## III. Marital Privilege.

¶ 23. Eison argues that the trial court erred in admitting testimony by his former wife because the testimony was subject to the marital privilege provided under WIS. STAT. § 905.05(2007–08). Specifically, Eison contends that Reynolds' testimony pertaining to his whereabouts after work the day of the robbery and car-jacking was subject to the privilege, as was testimony concerning his financial problems, his lack of contribution to the household expenses, payments from his employer, his gambling debts and the gun he possessed during the robbery. Although we agree that portions of Reynolds' testimony do reflect marital communications, we conclude that most of Reynolds' testimony was not privileged and that the privileged portions were not relevant to the outcome of Eison's case.

¶ 24. WISCONSIN STAT. § 905.05 codifies what is generally known as the marital privilege which, with some specific exceptions, protects communications between spouses. The statute provides as relevant here:

**905.05 Husband-wife privilege.**

**(1)** GENERAL RULE OF PRIVILEGE. *A person has a privilege to prevent the person's spouse or former spouse from testi-*

346

*fying against the person as to any private communication* by one to the other *made during their marriage.*

**(2)** WHO MAY CLAIM THE PRIVILEGE. *The privilege may be claimed by the person* or by the spouse on the person's behalf. The authority of the spouse to do so is presumed in the absence of evidence to the contrary.

(Emphasis added.)

¶ 25.   Courts have recognized limitations on the privilege. The privilege does not operate when third parties are present to hear or witness the communication. *See Abraham v. State*, 47 Wis. 2d 44, 53, 176 N.W.2d 349 (1970). The privilege does not apply to communications which "do not originate in confidence" or communications dealing with facts that are "equally accessible to third persons." *See Kain v. State*, 48 Wis. 2d 212, 216, 179 N.W.2d 777 (1970) (marital privilege did not apply to a wife's testimony pertaining to the defendant's present employment, his receipt of unemployment benefits, and the fact that he was laid off from his job); *see also State v. Sabin*, 79 Wis. 2d 302, 305–07, 255 N.W.2d 320 (1997) (a wife's observation of her husband driving off in her father's car was not "private" because the act was visible to any third person present on or looking at the public street).

¶ 26.   Here, Attorney Batt objected to Reynolds being called as a witness on marital privilege grounds; however, he did not pursue the objection after the State erroneously responded that only Reynolds was entitled to invoke the privilege.[5]

---

[5] Contrary to the State's assertion at trial (which the State concedes here was in error), under WIS. STAT. § 905.05 Eison was entitled to assert the marital privilege to prevent Reynolds

¶ 27.   On the subject of Eison's whereabouts between the end of his work shift and his arrival home, Reynolds testified as follows:

Q:   Calling your attention to April 21st of 2006 which was a Friday, did the defendant have to work that day?

A:   Yes.

. . . .

Q:   And do you know what time he was supposed to get off from work that day?

A:   Approximately six p.m.

Q:   And do you know how he was supposed to get home from work that day?

A:   I was supposed to pick him up.

Q:   Did you in fact pick him up?

A:   No.

Q:   When did you see him again after six o'clock?

A:   Approximately about two o'clock in the morning going into Saturday.

. . . .

Q:   What did you then hear at the front of the house?

from disclosing private communications that occurred during their marriage. His counsel invoked the privilege on Eison's behalf stating:   "my client would like to enter the request that [Reynolds] not be allowed to testify, that he would like to impose spousal immunity and not have her testify . . . in this matter." The court never ruled on the objection, the testimony proceeded, and Eison's counsel did not pursue the matter further.

A: My front doorbell rang.

Q: And who was at your front door?

A: Winston.

¶ 28. We assume, without deciding, that the agreement for Reynolds to pick Eison up from work was based on a marital communication; however, the remaining portion of the testimony above does not disclose any verbal communication between Reynolds and Eison. The fact that Eison was scheduled to work and the time he was scheduled to finish work were known to his employer and thus not subject to the marital communication privilege. *See Kain*, 48 Wis. 2d at 216. His arrival outside Reynolds' door at 2:00 a.m. was an act visible to anyone who might be passing on the street. *See Sabin*, 79 Wis. 2d at 306–07. The act of ringing a doorbell, generally meant to attract the attention of anyone inside of a building, was not a private communication between spouses in this case. The damaging fact resulting from this testimony—that Eison's whereabouts were unknown between 6:00 p.m. on April 21 and 2:00 a.m. the following morning—was not protected by marital privilege. We can discern no harm to Eison by disclosure of the agreement that Reynolds would pick Eison up after work. That fact was irrelevant to any element of the crime charged or the defense presented. We find it clear beyond a reasonable doubt that a rational jury would have found Eison guilty absent the error.

¶ 29. Reynolds also testified about Eison's financial problems and failure to contribute to the household bills:

Q: During the time just before Apri[l] 21st, 2006, was Mr. Eison having some financial difficulties?

A: Yes.

. . . .

Q: [H]e wasn't contributing to the household, correct?

A: Correct.

The testimony that Eison was "having some financial difficulties" may have come from a private communication between Eison and Reynolds, or it may have come from Reynolds' observation of Eison's conduct. We assume for purposes of this appeal that Reynolds' knowledge was based on a private communication with Eison. However, when viewed in the context of the rest of Reynolds' unprivileged testimony regarding Eison's financial affairs, it is clear beyond a reasonable doubt that a rational jury would have found Eison guilty absent the error.

¶ 30. While testifying about Eison's financial problems, Reynolds also testified that Eison had lied to her when claiming that his employer had not been paying him. Specifically she said:

Q: Do you know what was the cause of [Eison's] financial difficulties?

A: No, except he was saying he wasn't paid by his employer.

Q: Did you verify that?

A: Not until I would say Monday or Tuesday, April 23rd or 24th is when I actually talked to 'em.

Q: And was he actually getting paychecks when he told you he wasn't?

350

A: Yes.

. . . .

Q: During the time before April 21st, 2006, had he been bringing his paychecks home?

A: No.

Q: Had he been even saying he was getting a paycheck?

A: No, he said in fact that his employers were having money trouble and they weren't getting paid.

Q: Did you at some point find out if that was true or not?

A: I did. And that was again after he was in custody.

. . . .

A: In fact, he was getting paid according to them.

Q: Okay. And was he—I'm guessing if he told you that he wasn't getting paid but his employer told you he was getting paid, he wasn't contributing to the household, correct?

A: Correct.

¶ 31.   Eison's statement to Reynolds that he was not being paid by his employer was a communication within the marriage which was privileged under Wis. Stat. § 905.05, and should not have been admitted. The fact that Eison was untruthful in his statements to his wife[6] is not an exception to the privilege contained in

---

[6] The State asks us to hold, as a matter of public policy, that a communication between spouses loses its protection under

§ 905.05(3). The information that Eison was in fact being paid, however, is information Reynolds later obtained from Eison's employer, a third party source, and enjoys no protection under § 905.05.

¶ 32.   In addition, Reynolds testified about how she learned of Eison's gambling debts and about the gun used in the robbery:

> Q:   Did you subsequently find out from Mr. Eison what he had been doing with his money as opposed to paying his bills?
>
> A:   I did in a phone conversation when he was in custody.
>
> Q:   And who did you find that out from?
>
> A:   Himself.
>
> Q:   And what did he tell you?
>
> A:   He said it had to do with gambling, he had owed some people some money.
>
> Q:   Okay. In those conversations did you speak to him once or more than once when he was in custody?

---

WIS. STAT. § 905.05 when "the communication is deceptive." We decline to adopt such a policy for several reasons. First, the legislature has adopted a specific list of exceptions to the privilege. *See* § 905.05(3). Had it wished to exclude deceptive or untruthful communications between spouses, it could have done so. Second, determining what is "deceptive" or "untrue" in a statement is, in many cases, far from a simple task. Particularly in the intimate relationship involved, as many family law judges can attest, separating truth from belief or intentional deception from inadvertent misunderstanding, can be an arduous, time-consuming and often fruitless task. We decline to impose that burden on this state's trial courts. If such a dramatic policy change in the scope of marital privilege is to be adopted, it should be adopted by our supreme court or the legislature.

A: More than once.

Q: In those conversations—did he tel[l] you why he didn't come home that night?

A: Yeah, he said that he was not coming home until he was able to have all the money for us to pay our bills.

. . . .

Q: Did he indicate to you during those calls how much he owed in gambling debts?

A: Yeah, I think he said about $2,000.

. . . .

Q: Okay. At some point though didn't he tell you . . . that he had paid off his gambling debt?

A: Yeah, he told me that it was paid the night, on the 21st.

Q: And did you get any information after the 21st to indicate that he hadn't paid off the debt?

A: I never knew there was a debt until he got in custody and we talked over the phone. I didn't know anything about the gambling.

. . . .

Q: Okay. During those conversations [while Eison was in custody], did you talk to him about a gun or BB gun?

A: Yeah, he brought up -- in the course he brought up saying for me to get rid of one.

Q: So he asked you to get rid of a BB gun

A: Yes.

Q: And did you know where the BB gun was at that time?

A: Not until he told me where it was.

Q: Where did he tell you it was?

A: That it was in the hall closet up on the shelf between some green cushions.

Q: And did you look there?

A: Yes, I did.

Q: And did you find the gun?

A: Yes, I did.

Q: Okay. And what did you do with the gun?

A: I ended up calling the Glendale Police detective who came to visit me and told him that it was still in the home, I thought it was out of the home.

Q: And did you turn it over to them?

A: Yes, I did.

. . . .

Q: I'm going to walk up to you with this gun, and I'm going to show you what has been marked as Exhibit No. 8. Does that look familiar to you?

A: Yes.

Q: And why does it look familiar to you?

A: Because I gave it to [the detective].

. . . .

Q: Was that the gun you recovered from your home?

A: Yes.

354

¶ 33.   This testimony was not protected by the marital privilege because it was not a "private" communication. Reynolds testified that all of her conversations with Eison about his gambling debts, the reason he did not come home the night of the robbery, and about the gun, were telephone conversations that took place while Eison was in the Milwaukee County Jail. All outgoing telephone calls made by inmates of the jail are recorded, a policy that is disclosed to all inmates.[7] Because these telephone conversations were monitored, Eison knowingly exposed their contents to a third party. That constitutes a waiver of any marital privilege that might have applied to Eison's conversations with Reynolds. *See* WIS. STAT. § 905.11.[8]

**[17]**

¶ 34.   Had the select portions of Reynolds' testimony that were privileged marital communications (the agreement that Reynolds would pick Eison up from work and Eison's claim that his employer wasn't paying him) not been included, it is still clear beyond a reasonable doubt that a rational jury would have found Eison

---

[7] Eison does not refute the State's assertion that phone calls made by inmates are recorded, therefore we accept the assertion that Eison was on notice that his conversations with Reynolds would be recorded. *See State v. Chu*, 2002 WI App 98, ¶ 54, 253 Wis. 2d 666, 643 N.W.2d 878 (arguments not responded to in appellant's reply brief are deemed admitted).

[8] WISCONSIN STAT. § 905.11 provides:

WAIVER OF PRIVILEGE BY VOLUNTARY DISCLOSURE.   A person upon whom this chapter confers a privilege against disclosure of the confidential matter or communication *waives the privilege if* the person or his or her predecessor, while holder of the privilege, *voluntarily discloses* or consents to disclosure of any significant part of the matter or communication. This section does not apply if the disclosure is itself a privileged communication.

(Emphasis added.)

guilty. These statements do not tend to support proof of an element of the crimes with which Eison was charged, nor do they detract from any defense Eison might have asserted. Without hearing the privileged communications, a jury still would have known that: Eison was unaccounted for between 6:00 p.m. on April 21 and 2:00 a.m. on April 22, a time span which included the robbery; Corrigan's car was found about a block from Eison's home with a parking ticket issued on April 22 at 4:50 a.m., about two hours after Eison returned home; Eison had a gambling debt of about $2000 which he owed "some people"; Eison decided not to return home until he paid that debt; Eison's employer had been paying him; the gun he used to rob Corrigan was hidden in his house and delivered to police by Reynolds after he asked her to get rid of it; and, after having good light and substantial time to observe him, Corrigan unequivocally identified Eison as her abductor, identified his gun as the robbery weapon, and identified his jacket as the one worn by her abductor during the robbery. We conclude that it is clear beyond a reasonable doubt that a rational jury would have found Eison guilty absent the error of including the very limited privileged testimony from Reynolds. *See Harvey*, 254 Wis. 2d 442, ¶ 46.

## CONCLUSION

¶ 35. For all of the reasons we have explained above, we conclude that it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the errors asserted in this appeal.

*By the Court.*—Judgment and order affirmed.